# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **GILBERT ORTIZ, JR.,** | ) |
| | ) |
| **Plaintiff/Counter-defendant,** | ) |
| | ) **No.  01 C 9815** |
| **v.** | ) |
| | ) **Wayne R.  Andersen** |
| **METRA COMMUTER RAIL,** | ) **District Judge** |
| | ) |
| **Defendant/Counter-plaintiff.** | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on defendant Northeast Illinois Regional Commuter Railroad Corporation's, incorrectly identified in the complaint as Metra Commuter Rail, motion for summary judgment on plaintiff's claims of discrimination and retaliation and defendant's counterclaim for breach of fiduciary duty.  Plaintiff Gilbert Ortiz, Jr. filed a complaint against Northeast Illinois Regional Commuter Railroad Corporation ("Metra") alleging retaliation in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*  Plaintiff contends that Metra retaliated against him on five separate occasions for filing an internal complaint alleging national origin discrimination in January 2000 and later for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in April 2001.  Metra also has moved for summary judgment on its counterclaim for breach of fiduciary duty.  For the following reasons, we grant defendant's motion for summary judgment.

# BACKGROUND

The following undisputed facts are taken from Metra's Local Rule 56.1 Statement of Material Facts. Gilbert Ortiz Jr. is Hispanic and was hired by Metra on June 24, 1992 as an Equal Employment Opportunity ("EEO") Specialist. At the time Ortiz was hired, Gail Washington as Director of EEO and Employee Relations was his supervisor. Effective January 1, 1998, Ortiz' position was reclassified and given the new title of Senior EEO Specialist. Sometime in 1998, Washington was promoted to Department Head of Human Resources, and Countess Cary was hired as Director of EEO and Employee Relations and became Ortiz' supervisor.

Ortiz had various performance problems as a Senior EEO Specialist, including among other issues, insufficient knowledge about his job, timeliness, unprofessional behavior, failure to fulfill certain duties and insubordination. As Ortiz' supervisor, Cary was responsible for Ortiz' performance reviews. In November 1999, Ortiz' overall job performance was characterized as "marginally meeting expectations," and he received a rating of "below expectations" with regard to the quality of his work. As a result of this evaluation, Ortiz did not receive a pay increase.

In an effort to help Ortiz improve his performance, Cary provided him with a written clarification of his annual review in which, among other things, she informed Ortiz that he had to perform consistently for the next three months in order to bring his performance up to a level of "meets expectations." Cary met with Ortiz regarding his performance on January 28, 2000 and again on February 25, 2000. As of the February 2000 meeting, Ortiz had met only two of the four deadlines set in the January 28 meeting, and Cary offered to reassign the rest of Ortiz' work.

2

Cary again met with Ortiz on April 10, 2000 about his performance. Cary explained that although she had seen some effort on his part, Ortiz still needed to work on completing his assignments in a timely fashion. Cary set new deadlines for the outstanding projects that Ortiz was working on and extended his review period until May 31, 2000. On July 27, 2000, Cary provided Ortiz with his semi-annual performance review in which she noted, among other concerns, that there had been no significant change in Ortiz' performance and that he should continue working at completing his assignments in a thorough and timely manner. Cary also identified a specific plan of action for Ortiz to improve his time management.

Prior to receiving his 2000 semi-annual performance review, Ortiz and other employees submitted a memorandum to Executive Director Philip Pagano in January 2000, complaining about alleged national origin discrimination. Pagano directed Metra's Affirmative Action Executive Committee ("AAEC") to investigate the allegations of discrimination. The AAEC investigated Ortiz' allegations, including conducting interviews with Ortiz, Washington, Cary, and Ortiz' fellow EEO employee Joe Kransdorf. The AAEC completed its investigation of Ortiz' complaint and found no evidence of discrimination. In particular, the AAEC found that there was no basis to Ortiz' claim of discrimination regarding Gail Washington. The AAEC also found that Countess Cary's conduct was consistently justified. The AAEC evaluated the other complaints as well and concluded that there was no evidence of discrimination. The AAEC's report to Director Pagano on its finding relating to the discrimination allegations was unanimous.

Thereafter, Director Pagano discussed with the AAEC whether Metra should offer to give Ortiz another position at Metra given his lack of satisfaction working with Cary and Washington. The AAEC supported offering Ortiz the opportunity to move to another position, if he chose to

do so. Pagano subsequently informed Ortiz of the AAEC's conclusions concerning his complaint and also discussed with Ortiz the possibility of looking for a new position within Metra with no reduction in pay or status; Ortiz indicated a willingness to consider a new position. However, such a transfer was purely voluntary. Ortiz could stay in the EEO and Employee Relations department if he wanted to do so. Indeed, Ortiz admitted that Pagano directed Ortiz to work with the AAEC to find another job at Metra but that Ortiz was not being forced to move.

On September 13, 2000, Ortiz sent Pagano a memorandum discussing potential jobs in which he was interested. Pagano forwarded Ortiz' memorandum to the AAEC subcommittee working on the matter. The context in which the subcommittee met with Ortiz was as follows: Ortiz could stay where he was in the EEO department or he could move to another position that would be a career opportunity. However, Metra was not going to create a job for him.

Ortiz met with Art Sauceda and Harry Thomas and identified areas outside of the EEO department in which he was interested, including benefits, recruitment or becoming a hearing officer. However, the areas that Ortiz identified involved positions for which openings did not exist. At the time, there were four new open positions in the Training department. As part of that meeting, Sauceda and Thomas discussed Ortiz' interest in a training position and his prior application for a training position in the EEO department. Specifically, Ortiz had previously expressed an interest in, and had applied for, a position as an EEO training specialist in January 1999. At that time, Ortiz was one of five applicants selected for a second round of interviews for the position. On January 8, 1999, Cary sent a memorandum to each of the five applicants instructing them to prepare a presentation for the second interview. However, Ortiz did not prepare a presentation and, as a result, was not considered further for the position.

4

Sauceda and Thomas also met with John Wagner, Director of Metra's Workforce Education and Training, to discuss Ortiz' potential transfer to Wagner's department. Wagner indicated that he would welcome such a transfer. Ortiz subsequently met with Sauceda, Thomas, Wagner and William Tupper (another member of AAEC) about a potential lateral transfer to a training position in Metra's Workforce Education and Training department. Ortiz accepted a lateral transfer to the position of Training Specialist.

Ortiz' new training position began October 23, 2000. In this new position in the Workforce Education and Training department, Ortiz had the same salary, benefits, vacation time, holidays and worked the same shifts as his previous position in the EEO department. In his training position, Ortiz also was subject to the same policies and procedures and was in the same grade level as his previous position in the EEO department.

On December 1, 2000, Metra posted an opening for the position of Employment Specialist. The position was slotted at a P10 level with an anticipated salary range of $30,000 to low $40,000. The Employment Specialist position reported to Director of Personnel Harry Thomas. Metra received applications from 27 individuals, including Ortiz, all of whom were existing employees. For Ortiz, the Employment Specialist position was a lower position than his current position as a Training Specialist with a lower salary. As of January 1, 2001, Ortiz would receive a salary increase to $45,944.

On December 19, 2000, Metra's Qualifications Committee compared the qualifications of each individual candidate against the minimum qualifications set forth in the posting for Employment Specialist and found 25 applicants to be minimally qualified for the position. Several of the applicants subsequently withdrew or disqualified themselves from further

consideration for the position. In March and April 2001, the remaining candidates, including Ortiz, were interviewed by Thomas and two other individuals. Two candidates Luis Cuevas and Gail Svane were recommended, and ultimately hired, for the position as Employment Specialist.

Later in January 2001, Ortiz applied for another position, Senior Human Resources Generalist. However, the Senior Human Resources Generalist position never was filled because the needs of the Human Resources department changed after the position was posted. Gail Washington ultimately determined that the position was not needed and did not fill the Senior Human Resource Generalist position. Instead, Metra hired a Director of Special Projects, and Ortiz did not apply for the position.

In the fall of 2001, Metra created a new Drug and Alcohol Manager position. The Drug and Alcohol Manager would be responsible for the oversight and management of Metra's Drug and Alcohol Program, including such responsibilities as (1) developing policies for Metra's drug and alcohol program and assuring compliance with those policies, (2) developing training programs on the signs and symptoms of substance abuse, (3) establishing Metra's drug testing and collection procedures, (4) overseeing all random, reasonable cause and reasonable suspicion drug and alcohol testing, (5) coordinating a continuity of services among testers, laboratories and review officers, and (6) providing support to Metra's employee assistance program.

Several candidates applied for the job. After an initial round of interviews, the candidates were evaluated. Based on these evaluations, Washington decided to interview the top five candidates. Ortiz was not one of the finalists as he did not have any prior experience working with the administration of a drug and alcohol program. Ultimately, Washington hired Arturo Mota for the Drug and Alcohol Manager position, effective December 21, 2001.

After Ortiz transferred out of the EEO department into the Workforce Education and Training department in October 2000, Senior EEO Specialist Joseph Kransdorf assumed some of the duties that Ortiz used to perform. Kransdorf also was responsible for many managerial functions in the EEO department. Sometime in 2001 when a management position opened in the EEO department, Cary spoke with Washington about the position and recommended that Kransdorf become manager of the EEO department. The position was not posted, which was not unusual in certain circumstances. For example, when Ortiz became a Senior EEO Specialist in January 1998, the position was not posted. Moreover, when Ortiz was a Senior EEO Specialist, he was not performing many of the job duties that Kransdorf was responsible for to qualify for the EEO Manager position. To the contrary, Ortiz had difficulty performing the Senior EEO Specialist job. Based on Kransdorf's performance, he became EEO Manager.

Ortiz filed his complaint alleging retaliation against Metra on December 21, 2001. Thereafter, in January 2002, Metra posted a position for Communications/Customer Service Supervisor in the Transportation department. This position included a pay increase and involved supervisory responsibilities. Ortiz applied for, and ultimately was offered, this promotion notwithstanding the fact that he had filed his complaint. However, after Metra offered Ortiz the position, he withdrew his application.

During his deposition which was taken in June 2003, Ortiz first informed Metra that he had taken confidential documents from the EEO and Employee Relations department. Specifically, on the day that Ortiz transferred out of the EEO department and into the Training department, he removed approximately 2400 confidential documents, including such documents as personnel files, affirmative action reports, discrimination complaints, performance

evaluations, investigation reports, inter-offices memoranda on new hiring and promotions, employee medical documents and law department memoranda. In his deposition, Ortiz admitted that he was familiar with Metra's confidentiality policies. Ortiz also has admitted that the documents he removed from the EEO department were confidential and that the removal of those document was a violation of Metra's confidentiality policies. Later, Ortiz used these confidential documents to create a powerpoint presentation to support his allegations of national origin discrimination.

After discovering this information, Metra filed its counterclaim against Ortiz on July 17, 2003 alleging that he breached his fiduciary duty by copying, removing and disseminating confidential documents. Thereafter, in December 2003, Metra held a fact-finding hearing to determine whether Ortiz violated Metra's rules of conduct. After the hearing, Metra determined that Ortiz had violated its confidentiality policies and consequently discharged him effective February 17, 2004.

## DISCUSSION

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment may only be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue for trial, the court is "entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). When a proposed statement of fact is supported by the record evidence and not adequately rebutted, the court is

8

entitled to presume that statement is true for purposes of summary judgment. *Id.* When the denial of a proposed statement is not supported by the material cited, the moving party's assertion may be deemed admitted, regardless of what contrary evidence is in the record. *Id.*; *see also Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003); *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

Ortiz filed a response to Metra's statement of facts. Of the 327 numbered paragraphs submitted by Metra, Ortiz admits 295 of these paragraphs. Of the 32 paragraphs that Ortiz denies and disputes, he cites only to his affidavit. In addition, Ortiz includes 55 numbered paragraphs with a total of 90 subparts in his statement of additional facts. Of the 55 paragraphs that Ortiz submits, he cites solely to his affidavit for 43 paragraphs and each of the 90 subparts.

Federal Rule of Civil Procedure Rule 56(e) requires that affidavits offered in opposition to summary judgment be made on personal knowledge and set forth such facts as would be admissible at trial. "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998), quoting *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988). Self-serving affidavits without factual support in the record are not sufficient. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). In many instances, Ortiz' affidavit contains unsupported and conclusory assertions and legal argument.

Conclusory allegations alone will not defeat a motion for summary judgment. *Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 893-94 (7th Cir. 2003), citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990). Indeed, "Rule 56 demands something more

specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983). Moreover, "[s]peculation does not create a *genuine* issue of fact, instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (emphasis added).

In addition, Local Rule 56.1 for the Northern District of Illinois requires that parties support all disputed facts with specific references to the record and further emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of facts. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) (all relevant facts denied without supporting documentation must be accepted as true provided the facts are "properly supported by references to the record or other evidentiary materials"). Because Ortiz has failed to comply with Local Rule 56.1, we adopt Metra's statement of the facts in resolving this motion. However, Ortiz's failure to comply with the requirements of Local Rule 56.1 does not mean that summary judgment automatically will be granted in favor of Metra, as we still must "evaluate all facts in the light most favorable to plaintiff, the non-moving party." *Austin-Edwards v. Loyola Univ. Med. Ctr.*, 2004 WL 1243940, at *2 (N.D. Ill. June 3, 2004). In particular, it should be noted that we have reviewed and studied all of the materials submitted by Ortiz, and when appropriate, we have taken that material into consideration.

## B.    Ortiz Can Not Establish a Prima Facie Case of Retaliation

Under Title VII, an employer is prohibited from retaliating against an employee who has "opposed any practice made an unlawful employment practice ... or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Section 1981 provides in pertinent part: "All persons ... shall have the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a).  Retaliation claims under Title VII and section 1981 are evaluated by the same standard for liability. *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003).  Accordingly, this Court's analysis under Title VII is equally applicable to Ortiz' claims under section 1981.

In *Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir. 2002), the Seventh Circuit "clarified the standards for summary judgment on Title VII unlawful retaliation claims." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004). Specifically, *Stone* laid out two ways for a plaintiff to establish a prima facie case for unlawful retaliation -- a direct method of proof and an indirect method. *Id.*  Under the direct method of proof, a plaintiff may "present direct evidence (evidence that establishes without resort to inference from circumstantial evidence)" that the plaintiff engaged in protected activity and, as a result, suffered an adverse employment action. *Id.*  Direct evidence requires "an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003).

11

Under the indirect method of proof, a plaintiff must establish that, after engaging in protected activity, the plaintiff was subjected to an adverse employment action even though he was performing his job satisfactorily and no similarly situated employee who did not engage in any protected activity was subjected to the adverse employment action. *Hudson,* 375 F.3d at 559. Under the indirect method, failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim. *Id.* at 560. Moreover, "[e]ven where a plaintiff establishes all of the required elements to make out a prima facie case, if the employer presents unrebutted evidence of a non-invidious reason for the employment action at issue, the employer is entitled to summary judgment unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext for retaliation." *Id.; see also Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1146 (7th Cir.1997).

Ortiz argues that Metra retaliated against him on five separate occasions for submitting an internal complaint of discrimination in January 2000 and later for filing a complaint of discrimination with the EEOC in April 2001. Ortiz argues that Metra retaliated against him by (1) laterally transferring him to a training position in Metra's Workforce Education and Development department, (2) not selecting him for the Employment Specialist position for which he applied, (3) not selecting him for the Senior Human Resources Generalist position which never was filled, (4) not selecting him for the Drug and Alcohol Manager position for which he applied, and (5) not offering him the position of EEO Manager which was offered to one of his colleagues. Ortiz has not presented any direct evidence of retaliation to support any of these allegations. Therefore, we must examine his claims under the indirect method.

It is undisputed that Ortiz engaged in statutorily protected activities by submitting an internal complaint of discrimination in January 2000 and by filing a charge of discrimination with the EEOC in April 2001. Thus, we must examine the record to determine whether Ortiz was performing his job satisfactorily and/or qualified for any of the positions he sought, whether he suffered any adverse employment action, and whether he was treated less favorably than similarly situated individuals who did not engage in the protected conduct. We will address each claim of retaliation individually.

### 1. October 2000 Transfer to Workforce Education and Development Department

Ortiz first claims that Metra retaliated against him for submitting an internal complaint of discrimination in January 2000 by transferring him from Senior EEO Specialist to Training Specialist in October 2000. Metra asserts that Ortiz cannot establish a prima facie case of retaliation for two reasons. Metra contends that Ortiz cannot establish that he was performing his job satisfactorily or that he suffered an adverse employment action because he did not suffer any loss in pay or benefits as a result of his transfer to the Training department.

The record shows that Ortiz was having difficulty performing his job. Indeed, Ortiz admits that he was experiencing performance problems as a Senior EEO Specialist and that he had received performance evaluations which stated that he was not meeting his job expectations. However, in his affidavit without any citation to the record, Ortiz states that he, in fact, was performing his job satisfactorily and that his job evaluations were always good. These assertions without factual support are simply not enough to overcome Ortiz' burden. "An employee's self-serving statements about [his] ability ... are insufficient to contradict an employer's negative

13

assessment of that ability." *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992). Ortiz cannot establish a genuine issue of fact based upon his own assertions that he was performing his job satisfactorily.

Second, Metra argues that the lateral transfer Ortiz choose to accept was not a an adverse employment action. The Seventh Circuit has broadly defined what constitutes an "adverse employment action." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001), citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). An adverse action "must be materially adverse to be actionable, meaning more than a mere inconvenience or an alteration of job responsibilities." *Id.* Adverse employment actions may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* Although adverse employment actions do not need to be quantifiable in terms of pay or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441.

In the retaliation context, a plaintiff must, at a minimum, "complain of some action on the employer's part that causes [the plaintiff] to suffer real harm." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003). Ortiz' transfer, without more, does not rise to the level of an adverse employment action for purposes of Title VII. *See, e.g., Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."). "A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Id.* (collecting cases). It is not

14

disputed that Ortiz received the same salary, benefits, vacation time, holidays and worked the same shift as a Training Specialist in the Workforce Education and Development department as he had in his previous position in the EEO department. Thus, Ortiz' transfer does not qualify as an adverse employment action.

Moreover, Ortiz has failed to demonstrate that he was treated less favorably than other similarly situated employees. Under this prong, Ortiz must show that he, "and not any otherwise similarly situated employee who did not complain, was ... subjected to an adverse employment action." *Stone,* 281 F.3d at 642. An employee is similarly situated if he is "directly comparable to [the plaintiff] in all material respects." *Rogers,* 320 F.3d at 755. Ortiz fails to identify any other Metra employee who filed an internal complaint, but nevertheless was not transferred to a different position. There is no evidence in the record that any such similarly situated employee exists. Accordingly, we conclude that Ortiz has not established a prima facie case under the indirect method. Thus, Ortiz fails to state a claim for retaliation based on his transfer to Training Specialist in October 2000.

Even if Ortiz were able to establish a prima facie case of retaliation, Metra has asserted a legitimate, non-retaliatory reason for its action. Ortiz was transferred as a result of a mutual agreement between Ortiz and Metra as a result of Ortiz' dissatisfaction with his supervisor in the EEO department. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 396 (7th Cir. 1998).

15

In order to satisfy his burden of persuasion, Ortiz must show that Metra's proffered reasons is pretextual. To demonstrate pretext, a plaintiff must show that each of the defendant's articulated reasons for its employment decision either "(1) had no basis in fact; (2) did not actually motive [the employment decision]; (3) was insufficient to motivate [the employment decision]." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001).

There is nothing in the record showing that Metra is lying about its proffered explanation, and Ortiz has not introduced a scintilla of evidence demonstrating that his transfer to a Training Specialist in the Workforce Education and Development department was in retaliation for his filing an internal complaint of discrimination. In sum, Ortiz has failed to establish a prima facie case of retaliation and cannot demonstrate that Metra's proffered reason for transferring him was a pretext for any retaliatory intent. Thus, we find that there are no issues of material fact, and Metra is entitled to summary judgment on this claim.

### 2.    Not Selecting Ortiz for the Employment Specialist Position

Ortiz also argues that Metra retaliated against him for filing his January 2000 internal complaint by not selecting him for the Employment Specialist position in April 2001. However, it is not disputed that the position was a lower grade with a lower salary range than what Ortiz was earning as a Training Specialist. Thus, Ortiz cannot establish that he suffered any adverse employment action.

16

In addition, Ortiz has failed to demonstrate that he was treated less favorably than other similarly situated employees. Ortiz fails to identify any other Metra employee who filed an internal complaint and was selected for the Employment Specialist position. There is no evidence in the record that any such similarly situated employee exists. Accordingly, we conclude that Ortiz has not presented a prima facie case under the indirect method. Thus, Ortiz fails to state a claim for retaliation as a result of Metra not selecting him for the Employment Specialist position.

Moreover, Metra has articulated a legitimate, non-retaliatory reason for its decision. Metra asserts that the individual selected for the Employment Specialist position did a better job interviewing and had more relevant experience than Ortiz. As stated above, we will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs*, 153 F.3d at 396. There is nothing in the record showing that Metra is lying about its proffered explanation, and Ortiz has not introduced any evidence demonstrating that Metra's refusal to select him for the Employment Specialist position was in retaliation for his filing an internal complaint of discrimination. In sum, Ortiz has failed to establish a prima facie case of retaliation and cannot demonstrate that Metra's proffered reason for not selecting him for the Employment Specialist position was a pretext for any retaliatory intent. Thus, we find that there are no issues of material fact, and Metra is entitled to summary judgment on this claim.

### 3. Not Selecting Ortiz for the Senior Human Resource Generalist Position

Ortiz argues that Metra retaliated against him for filing an EEOC charge in April 2001 by not selecting him for the position of Senior Human Resource Generalist. However, it is not

17

disputed that Metra never hired anyone for the position of Senior Human Resource Generalist. Instead, Metra created and filled the position of Director of Special Projects for which Ortiz never applied. Indeed, Ortiz admits that he did not think he was qualified for the position. Thus, Ortiz cannot establish a prima facie case of retaliation based on Metra's decision not to fill the Senior Human Resource Generalist position.

Moreover, Metra has articulated a legitimate, non-retaliatory reason for its decision. Metra never filled the Senior Human Resource Generalist position but rather hired a Director of Special Projects for which Ortiz never applied. There is nothing in the record showing that Metra is lying about its proffered explanation, and Ortiz has not introduced any evidence demonstrating that Metra's decision not to hire Ortiz was in retaliation for his filing a charge of discrimination with the EEOC in April 2001. In sum, Ortiz has failed to establish a prima facie case of retaliation and cannot demonstrate that Metra's proffered reason for not filling the Senior Human Resource Generalist position was a pretext for any retaliatory intent. Thus, we find that there are no issues of material fact, and Metra is entitled to summary judgment on this claim.

### 4. Not Selecting Ortiz for the Drug and Alcohol Manager Position

Ortiz again asserts that Metra retaliated against him as a result of his filing the April 2001 EEOC charge by not selecting him for the position of Drug and Alcohol Manger. However, Metra is entitled to summary judgment on this claim because Ortiz has failed to establish that he was qualified for the position or that a similarly situated individual was treated favorably. Indeed, Ortiz admits that he did not have any experience working with the administration of a drug and alcohol program. In addition, Ortiz also acknowledged that Arturo Mota who

18

ultimately was chosen for the position of Drug and Alcohol Manager did, in fact, have more relevant experience than Ortiz.

Metra also asserts that its legitimate, non-retaliatory reason decision for not selecting Ortiz for the drug and alcohol management position is because Ortiz was not qualified for the position. There is nothing in the record showing that Metra is lying about its proffered explanation, and Ortiz has not introduced any evidence demonstrating that Metra's decision not to hire him for the Drug and Alcohol Manager position was in retaliation for filing a charge of discrimination with the EEOC in April 2001. In sum, Ortiz has failed to establish a prima facie case of retaliation and cannot demonstrate that Metra's proffered reason was a pretext for any retaliatory intent. Thus, we find that there are no issues of material fact, and Metra is entitled to summary judgment on this claim.

### 5. Not Selecting Ortiz for the EEO Manager Position

Ortiz finally contends that Metra retaliated against him for filing a charge of discrimination with the EEOC in April 2001 by denying him the opportunity to become EEO Manager in January 2002. However, Ortiz did not even apply for the EEO Manager position. Indeed, it never was posted because Joe Kransdorf, a former colleague of Ortiz, was promoted to the position. Moreover, Ortiz cannot establish that he was qualified for the position. Indeed, Ortiz admits that he had consistent performance problems while working as an EEO Specialist, and as a result of those problems, he transferred to the Workforce Education and Development department and became a Training Specialist.

Even if Ortiz were able to establish a prima facie case for retaliation, Metra has articulated a legitimate, non-retaliatory reason for awarding the management position to

Kransdorf. Specifically, Ortiz had transferred out of the EEO department and was working as a Training Specialist in the Workforce Education and Development department, and after that transfer, Kransdorf assumed some of the duties that Ortiz had performed in addition to performing many managerial functions in the EEO department. Thus, Kransdorf was given the title of Manager of the EEO department to reflect the additional duties he had assumed and was performing satisfactorily.

There is nothing in the record showing that Metra is lying about its proffered explanation, and Ortiz has not introduced any evidence demonstrating that Metra's decision to select Kransdorf instead of Ortiz for the EEO Manager position was in retaliation for his filing a charge of discrimination with the EEOC in April 2001. In sum, Ortiz has failed to establish a prima facie case of retaliation and cannot demonstrate that Metra's proffered reason was a pretext for any retaliatory intent. Thus, we find that there are no issues of material fact, and Metra is entitled to summary judgment on this claim.

### C. Metra Is Entitled to Summary Judgment on its Counterclaim for Breach of Fiduciary Duty

Finally, we consider Metra's counterclaim for breach of fiduciary duty. Metra argues that it is entitled to summary judgment on its breach of fiduciary duty claim because Ortiz does not dispute that he copied, removed and disseminated confidential Metra documents. While employed by Metra in the EEO department from June 1992 through October 2000, Ortiz was entrusted with confidential documents and information. Ortiz admits that he was aware of Metra's policies and procedures to keep such information confidential and he knew that it would be a violation of Metra's policies to remove any confidential documents and information from

the EEO department. Nevertheless, when Ortiz transferred to the Workforce Education and Development department, he copied and removed approximately 2400 confidential documents from the EEO department. Ortiz also subsequently disseminated some of those confidential documents.

To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must prove (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages as a result of that breach. *McLaughlin v. Chicago Transit Authority*, 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003). Based on the facts admitted by Ortiz, we conclude that he has breached the fiduciary duty he owed Metra. Although Ortiz asserts that he was not a manager and, therefore, did not have any fiduciary duty, he was entrusted with confidential information and had an obligation to maintain the confidentiality of such information. In addition, Ortiz admits that he was aware of Metra's policies to maintain the confidentiality of such information and not to remove any such information from the EEO department. Nevertheless, Ortiz disregarded Metra's policies and removed confidential documents. As such, Metra is entitled to summary judgment on its counterclaim.

## CONCLUSION

For all of the foregoing reasons, defendant Metra's motion for summary judgment is granted. The parties are ordered to appear for status on March 17, 2005 to discuss the issue of damages.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: _February 18, 2005_